**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**OHIO VALLEY ENVIRONMENTAL
COALITION INC, WEST VIRGINIA
HIGHLANDS CONSERVANCY INC.,
and SIERRA CLUB,**

**Plaintiffs,**

**v.**                                        CIVIL ACTION NO. ___3:14-cv-11333___

**POCAHONTAS LAND CORPORATION,**

**Defendant.**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR CIVIL
PENALTIES**

**INTRODUCTION**

1.      This citizen suit is an action for declaratory judgment, mandatory injunctive

relief, and civil penalties against Defendant Pocahontas Land Corporation ("Pocahontas") for

discharging pollutants in violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251

et seq. (hereinafter "the Clean Water Act" or "the CWA") from at least three unpermitted point

sources of pollution at two locations in Mingo County, West Virginia.  Those point sources

discharge into an unnamed tributary of Right Fork of Ben Creek and into Buck Branch of Right

Fork of Ben Creek, all of Tug Fork, and/or tributaries of these streams.  These streams are waters

of the United States.

2.      As detailed below, Plaintiffs allege that the Defendant, as owner of the point

sources, discharged and continues to discharge (1) total dissolved solids (TDS), (2) sulfates

($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine

drainage into waters of the United States without a National Pollution Discharge Elimination

System ("NPDES") Permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §

1342, in persistent violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question) and 33 U.S.C. § 1365 (Clean Water Act citizen suit provision).

4.      On November 25, 2013, Plaintiffs gave notice of the violations and their intent to

file suit to the Defendant, the United States Environmental Protection Agency ("EPA"), and the

West Virginia Department of Environmental Protection ("WVDEP"), as required by Section

505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5.      More than sixty days have passed since notice was served and no state or federal

government agency has commenced and diligently prosecuted a civil or criminal action to

redress the violations.

6.      Venue in this District is proper pursuant to 33 U.S.C. § 1365(c)(1) because the

sources of the Clean Water Act violations are located in this District.

## PARTIES

7.      Defendant Pocahontas is a Virginia corporation that owns property where the

violations complained of in this action have occurred and are occurring.

8.      Pocahontas is a person within the meaning of Section 502(5) of the Clean Water

Act, 33 U.S.C. § 1362(5).

9.      At all relevant times, Pocahontas owned a tract or parcel of land on the Right Fork

of Ben Creek, a tributary of the Tug Fork of the Big Sandy River, in Mingo County, West

Virginia, on which at least one valley fill was constructed during the operations of the Twisted

Gun Gap Surface Mine. The property containing the valley fill is located on Mingo County tax

map sheet 512, parcel 12. The deed conveying the property containing the valley fill to Pocahontas begins on page 77 of Mingo County deed book volume 288.

10.     At all relevant times, Pocahontas owned a certain tract or parcel of land on Buck Branch of Right Fork of Ben Creek, a tributary of the Tug Fork of the Big Sandy River, in Mingo County, West Virginia, on which at least two valley fills were constructed during the operation of the Pounding Mill No. 1 Surface Mine. The property containing the valley fills is located on Mingo County tax map sheet 532, parcel 6. The deed conveying the property containing the valley fills to Pocahontas begins on page 77 of Mingo County deed book volume 288.

11.     Plaintiff Ohio Valley Environmental Coalition (hereinafter "OVEC") is a nonprofit organization incorporated in Ohio.  Its principal place of business is in Huntington, West Virginia.  It has approximately 1,500 members.  Its mission is to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing, coalition building, leadership development, and media outreach.  OVEC has focused on water quality issues and is a leading source of information about water pollution in West Virginia.

12.     Plaintiff Sierra Club is a nonprofit corporation incorporated in California, with more than 600,000 members and supporters nationwide and approximately 1,900 members who reside in West Virginia and belong to its West Virginia Chapter.  The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club's concerns encompass the exploration,

enjoyment and protection of surface waters in West Virginia.

13.     Plaintiff West Virginia Highlands Conservancy, Inc., (hereinafter "WVHC") is a nonprofit organization incorporated in West Virginia.  It has approximately 1,700 members.  It works for the conservation and wise management of West Virginia's natural resources.

14.     At least one of Plaintiffs' members suffers injuries to her aesthetic, recreational, and environmental interests as a result of Defendant's unpermitted discharges of total dissolved solids (TDS), sulfates ($SO_4^{2-}$), and other ions associated with the measure of conductivity in surface coal mine drainage. At least one of Plaintiffs' members lives in Mingo County and has visited in the past and plans to continue to visit Ben Creek, including the areas receiving Defendant's discharges. That member is aware of Defendant's unpermitted discharges from its valley fills and of elevated levels of TDS, sulfates, and conductivity in the streams receiving those discharges. Plaintiffs' member knows that the levels of those pollutants observed in the streams receiving Defendant's discharges can harm animals and is concerned about the effects of the unregulated discharges on aquatic life, birds, and other wildlife that rely on healthy streams. That member's knowledge of Defendant's unmonitored, unregulated discharges causes her to enjoy the affected waterways less than she would otherwise. Plaintiffs' member's knowledge of the unregulated discharges causes her to refrain from bringing her grandchildren to enjoy the affected waters in the ways that Plaintiffs' member did when she was a child. If Defendant's unlawful discharges ceased or were properly regulated by a Clean Water Act permit, Plaintiffs' member would enjoy her visits to the affected waterways more and would be more likely to use them in ways that she now refrains from doing.  Injunctions and/or civil penalties would redress Plaintiffs' members' injuries by preventing and/or deterring future violations.

15.     At all relevant times, Plaintiffs were and are "persons" as that term is defined by

4

the CWA, 33 U.S.C. § 1362(5).

## STATUTORY AND REGULATORY FRAMEWORK

16.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as a National Pollution Discharge Elimination System ("NPDES") Permit issued by the EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

17.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the permit issuing authority may issue a NPDES Permit that authorizes the discharge of any pollutant directly into waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

18.     At all times relevant to this complaint, the State of West Virginia has been authorized by EPA to administer a NPDES program for regulating the discharges of pollutants into the waters of West Virginia.  Permits issued under this program are known as "WV/NPDES" permits.

19.     Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes any "citizen" to "commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

20.     Section 505(f)(1) of the CWA defines "an effluent standard or limitation under this chapter," for purposes of the citizen suit provision in Section 505(a) of the CWA, 33 U.S.C. § 1365(a), to mean, among other things, an unlawful act under Section 301(a), 33 U.S.C. § 1311(a), of the CWA

21.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant to comply with the CWA and to assess civil penalties under Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

22.     Section 309(d), 33 U.S.C. § 1319(d), provides that any person who violates Section 301, 33 U.S.C. § 1311, or violates any permit condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty payable to the United States of up to $25,000 per day for each violation.

23.     Pursuant to the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C § 2461 note, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, the court may assess a civil penalty of $37,500 per day for each violation that occurred after January 12, 2009. See 40 C.F.R. § 19.4.

24.     Under Section 505(d) of the CWA, 33 U.S.C § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

## FACTS

### *Valley Fills*

25.     Valley fills, also known as durable rock fills or hollow fills, are a common feature of Appalachian surface coal mining.

26.     Valley fills are a result of the expansion of rock that occurs when mountains are blown up.  Excess rock and soil are placed in nearby valleys, covering headwater streams and forming valley fills.

27.     Valley fills are engineered structures.  They are designed with a rock core underdrain, to direct water under the fill.  They also sometimes have drainage ditches along the

6

sides of the fill or down the center surface.  The water percolating through the fill and draining along the sides and center is discharged at the toe of the fill as surface water.

28.     Precipitation and groundwater percolate through overburden on the mine site and valley fill, dissolving minerals in the rock, such that the water discharged out the toe of the fill includes added pollutants.

29.     Drainage from valley fills is characterized by significantly elevated levels of sulfate ions ($SO_4^{2-}$) accompanied by, among other things, calcium, magnesium, and bicarbonate ions ($Ca^{2+}$, $Mg^{2+}$, $HCO_3^-$), all of which contribute to elevated levels of total dissolved solids (TDS) and conductivity. *See, e.g.,* Bernhardt et al., *How Many Mountains Can We Mine? Assessing the Regional Degradation of Central Appalachian Rivers by Surface Coal Mining,* Environmental Science and Technology, 2012, Vol. 46, p. 8115; U.S. Environmental Protection Agency, *Final Determination of the Assistant Administrator for Water Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, WV*, January 13, 2011, at 58-60.

30.     The elevated levels of total dissolved solids (TDS), sulfates ($SO_4^{2-}$), and other ions associated with the measure of conductivity in surface coal mine drainage that are consistently found in the streams that receive discharges from valley fills cause significant adverse impacts to aquatic life communities. *See* Palmer and Bernhardt, *Mountaintop Mining Valley Fills and Aquatic Ecosystems: Scientific Primer on Impacts and Mitigation Approaches*, at 3. Those impacts result in violations of West Virginia's narrative aquatic life water quality standards. *See* 47 C.S.R. §§ 3.2.e and 3.2.i.

*///*

### *Twisted Gun Gap Surface Mine*

31.      Defendant took ownership of a tract of land on the Right Fork of Ben Creek, a tributary of the Tug Fork of the Big Sandy River, identified as parcel 12 on sheet 512 of the tax map for Mingo County, West Virginia (hereinafter "Parcel 12"), under a deed from Royal Land Company to Pocahontas dated December 5, 1986.

32.      On or about March 25, 1976, the WVDEP first issued Surface Mining Control and Reclamation Act ("SMCRA") Permit S008476 to Chafin Branch Coal Company for the operation of the Twisted Gun Gap Surface Mine on lands including Parcel 12.

33.      During the course of operations of the Twisted Gun Gap Surface Mine, a valley fill was constructed in an unnamed tributary of Right Fork of Ben Creek.  The valley fill (hereinafter "Parcel 12 Valley Fill") was constructed and remains on lands within Parcel 12.

34.      The Parcel 12 Valley Fill is a durable rock fill.  Durable rock fills are engineered to convey water through underdrains, center drains, and/or side drains to the stream channel located at the toe of the fill.

35.      During operation of the surface mine, discharges of pollutants from the Parcel 12 Valley Fill were regulated by WV/NPDES Permit WV0043338.

36.      On or about September 9, 1996, the WVDEP released SMCRA Permit S008476. On or about October 26, 1997, WVDEP released WV/NPDES Permit WV0043338.  On information and belief, discharges from the Parcel 12 Valley Fill are no longer authorized or regulated by a WV/NPDES or SMCRA permit.

37.      Upon information and belief, the Parcel 12 Valley Fill continues to discharge pollutants, including (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions

associated with the measure of conductivity in surface coal mine drainage, into the unnamed tributary of Right Fork of Ben Creek.

38.     On December 13, 2012, a water sampler hired by Sierra Club took a water sample less than one quarter mile downstream of the discharge from the Parcel 12 Valley Fill. The sample was taken in the unnamed tributary of Right Fork of Ben Creek at the culvert that passes under Right Fork of Ben Creek Road, just above where the tributary enters Right Fork of Ben Creek. The sample demonstrated a total dissolved solids (TDS) concentration of 802 mg/L, a sulfates ($SO_4^{2-}$) concentration of 449 milligrams per liter (mg/L), and conductivity of 1106 microsiemens per centimeter (µS/cm).

39.     No other valley fills drain into the unnamed tributary of Right Fork of Ben Creek and upon information and belief there are no other sources of pollution between the Parcel 12 Valley Fill and the sample location that would account for the pollutant levels measured by Sierra Club's water sampler.  Accordingly, plaintiffs allege that the Parcel 12 Valley Fill is discharging (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage into the unnamed tributary of Right Fork of Ben Creek.

40.     The Parcel 12 Valley Fill is a point source as that term is used in the context of the CWA, 33 U.S.C. § 1362(14).

41.     The Parcel 12 Valley Fill conveys discharges of groundwater and surface water into the unnamed tributary of Right Fork of Ben Creek at or near its toe.

42.     The unnamed tributary flows into the Right Fork of Ben Creek, which flows into Ben Creek, which flows into the Tug Fork of the Big Sandy River, which is navigable-in-fact.

Those are all waters of the United States as that term is used in the context of the CWA, 33 U.S.C. § 1362(7).

43.     Total dissolved solids (TDS), sulfates ($SO_4^{2-}$), and the other ions associated with the measure of conductivity in surface coal mine drainage are all pollutants under the CWA, 33 U.S.C. § 1362(6).

44.     Neither Defendant nor any other entity possesses a permit to discharge pollutants from the Parcel 12 Valley Fill into the unnamed tributary of Right Fork of Ben Creek.

45.     In light of the nature of pollution discharges from valley fills and in the absence of any evidence that Defendant or any other party has made efforts to prevent future pollution discharges from the Parcel 12 Valley Fill, Plaintiffs allege that Defendant has committed additional unpermitted discharges since December 2012, and is in continuing violation of the Clean Water Act.

### *Pounding Mill No. 1 Surface Mine*

46.     Defendant took ownership of a tract of land encompassing Buck Branch of Right Fork of Ben Creek, a tributary of the Tug Fork of the Big Sandy River, identified as parcel 6 on sheet 532 of the tax map for Mingo County, West Virginia (hereinafter "Parcel 6"), under a deed from Royal Land Company to Pocahontas dated December 5, 1986.

47.     On or about October 17, 1989, WVDEP first issued SMCRA Permit S503889 to Mingo Logan Coal Company for the operation of the Pounding Mill No. 1 Surface Mine on lands including Parcel 6.

48.     During the course of its operation of the Pounding Mill No. 1 Surface Mine, Mingo Logan Coal Company constructed Durable Rock Fill No. 4-5 in Buck Branch of Right Fork of Ben Creek, or in an unnamed tributary thereof, as authorized by SMCRA Permit

S503889.  Durable Rock Fill No. 4-5 is located on Parcel 6.

49.    During the course of its operation of the Pounding Mill No. 1 Surface Mine,

Mingo Logan Coal Company constructed Durable Rock Fill No. 6 in Buck Branch of Right Fork

of Ben Creek, or in an unnamed tributary thereof, as authorized by SMCRA Permit S503889.

Durable Rock Fill No. 6 is located on Parcel 6.

50.    Durable rock fills, such as Durable Rock Fill No. 4-5 and Durable Rock Fill No.

6, are constructed in streams and are engineered to convey water through underdrains, center

drains, and side drains to the stream channel located at the base, or toe, of the fill.

51.    While the Pounding Mill No. 1 Surface Mine was in operation, its discharges into

the waters of the United States were regulated by WV/NPDES Permit WV1016288.

52.    Outlet 031 on WV/NPDES Permit WV1016288 authorized discharges from a

sediment pond, identified as Pond No. 3, downstream of Durable Rock Fill No. 4-5 and Durable

Rock Fill No. 6, which received discharges from Durable Rock Fill No. 4-5 and Durable Rock

Fill No. 6.

53.    In 2007, SMCRA Permit S503889 was transferred to Cobra Natural Resources

LLC.

54.    On or about November 30, 2011 WVDEP released SMCRA Permit S503889. On

or about December 7, 2006, WVDEP granted Minor Modification No. 19, deleting Outlet 031

from WV/NPDES Permit WV1016288.  On information and belief, discharges from Durable

Rock Fill No. 4-5 and Durable Rock Fill No. 6 are no longer authorized or regulated by a

WV/NPDES or SMCRA permit.

55.    Upon information and belief, Durable Rock Fill No. 4-5 and Durable Rock Fill

No. 6 continue to discharge pollutants, including (1) total dissolved solids (TDS), (2) sulfates

($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage, into Buck Branch of Right Fork of Ben Creek.

56.     On December 13, 2012, a water sampler hired by Sierra Club took a water sample roughly one half mile downstream of the discharges from Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6. The sample was taken in Buck Branch of Right Fork of Ben Creek at the culvert that passes under Right Fork of Ben Creek Road, just above where Buck Branch enters Right Fork of Ben Creek. The sample demonstrated a total dissolved solids (TDS) concentration of 502 mg/L, a sulfates ($SO_4^{2-}$) concentration of 312 milligrams per liter (mg/L), and conductivity of 746 microsiemens per centimeter ($\mu$S/cm).

57.     No valley fills other than Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 drain into Buck Branch of Right Fork of Ben Creek and upon information and belief there are no other sources of pollution between the Durable Rock Fills and the sample location that would account for the pollutant levels measured by Sierra Club's water sampler.  Accordingly, plaintiffs allege that Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 are discharging (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage into Buck Branch of Right Fork of Ben Creek.

58.     Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 are point sources as that term is used in the context of the CWA, 33 U.S.C. § 1362(14).

59.     Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 convey discharges of groundwater and surface water into Buck Branch of Right Fork of Ben Creek at or near their toe.

60.     Buck Branch flows into the Right Fork of Ben Creek, which flows into Ben Creek, which flows into the Tug Fork of the Big Sandy River, which is a navigable-in-fact water.

Those are all waters of the United States as that term is used in the context of the CWA, 33 U.S.C. § 1362(7).

61.     Total dissolved solids (TDS), sulfates ($SO_4^{2-}$), and the other ions associated with the measure of conductivity in surface coal mine drainage are all pollutants under the CWA, 33 U.S.C. § 1362(6).

62.     Neither Defendant nor any other entity possesses a permit to discharge pollutants from Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 into Buck Branch of Right Fork of Ben Creek.

63.     In light of the nature of pollution discharges from valley fills and in the absence of any evidence that Defendant or any other party has made efforts to prevent future pollution discharges from Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6, Plaintiffs allege that Defendant has committed additional unpermitted discharges since December 2012, and is in continuing violation of the Clean Water Act.

### *Plaintiffs' November 25, 2013 Notice of Intent to Sue*

64.     Plaintiffs sent a notice of intent letter (hereinafter, "NOI"), postmarked on November 25, 2013, to Defendant, notifying it that its ongoing unpermitted discharges of (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage from the point sources described above violate the Clean Water Act.

65.     The NOI also notified Defendant of Plaintiffs' intent to sue Defendant for those violations at the end of the 60-day period required by statute.

66.     The NOI was sent by certified mail, return receipt requested, to the following persons: Defendant; Defendant's Registered Agent for Service of Process; Secretary Randy

Huffman, WVDEP; Shawn M. Garvin, Regional Administrator of EPA Region III; and Gina McCarthy, Administrator of EPA.

## FIRST CLAIM FOR RELIEF

67.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 66 *supra*.

68.    Defendant's wastewater discharges identified in the above paragraphs are discharges of pollutants from a point source or sources into navigable waters of the United States within the meaning of Section 301 of the Clean Water Act, which prohibits the discharge of any pollutant by any person, except in compliance with a permit. 33 U.S.C. § 1311.

69.    Defendant does not hold a WV/NPDES Permit to authorize the discharge of (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), or (3) other ions associated with the measure of conductivity in surface coal mine drainage from the Parcel 12 Valley Fill to the unnamed tributary of Right Fork of Ben Creek of Tug Fork.

70.    Under Section 505(f) of the Clean Water Act, 33 U.S.C. § 1365(f), the prohibition against unpermitted discharges under Section 301 is an "effluent standard or limitation" subject to enforcement through the citizen suit provision at Section 505(a)(1) of the Act.  33 U.S.C. § 1365(a)(1).

71.    As established by Plaintiffs' sampling, Defendant discharged (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage into the unnamed tributary of Right Fork of Ben Creek of Tug Fork in violation of Section 301(a) in December 2012.

72.    On information and belief, Plaintiffs allege that Defendant is in continuing and/or intermittent violation of the Clean Water Act as a result of its ongoing pollutant discharges

because Defendant has taken no meaningful action to eradicate the underlying cause of the discharges or to obtain a permit for the discharges.

73.     Because of its unpermitted discharges, Defendant is in violation of the prohibition in the Clean Water Act on discharges of pollutants without a permit. 33 U.S.C § 1311. This prohibition is enforceable pursuant to Sections 505(a)(1) and 505(f)(1) of the CWA, 33 U.S.C. §§ 1365(a)(1), 1365(f)(1).

74.     Unless enjoined, Defendant will remain in violation of the Clean Water Act.

75.     Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d) and 1365, Defendant is liable for civil penalties of up to $37,500 per day for its unpermitted discharges.

## SECOND CLAIM FOR RELIEF

76.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 75 *supra*.

77.     Defendant's wastewater discharges identified in the above paragraphs are discharges of pollutants from a point source or sources into navigable waters of the United States within the meaning of Section 301 of the Clean Water Act, which prohibits the discharge of any pollutant by any person, except in compliance with a permit. 33 U.S.C. § 1311.

78.     Defendant does not hold a WV/NPDES Permit to authorize the discharge of (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), or (3) other ions associated with the measure of conductivity in surface coal mine drainage from Durable Rock Fill No. 4-5 and Durable Rock Fill No. 6 to Buck Branch of Right Fork of Ben Creek.

79.     Under Section 505(f) of the Clean Water Act, 33 U.S.C. § 1365(f), the prohibition against unpermitted discharges under Section 301 is an "effluent standard or limitation" subject

to enforcement through the citizen suit provision at Section 505(a)(1) of the Act.  33 U.S.C. § 1365(a)(1).

80.     As established by Plaintiffs' sampling, Defendant discharged (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the measure of conductivity in surface coal mine drainage into Buck Branch of Right Fork of Ben Creek in violation of Section 301(a) in December 2012.

81.     On information and belief, Plaintiffs allege that Defendant is in continuing and/or intermittent violation of the Clean Water Act as a result of its ongoing pollutant discharges because Defendant has taken no meaningful action to eradicate the underlying cause of the discharges or to obtain a permit for the discharges.

82.     Because of its unpermitted discharges, Defendant is in violation of the prohibition in the Clean Water Act on discharges of pollutants without a permit. 33 U.S.C § 1311. This prohibition is enforceable pursuant to Sections 505(a)(1) and 505(f)(1) of the CWA, 33 U.S.C. §§ 1365(a)(1), 1365(f)(1).

83.     Unless enjoined, Defendant will remain in violation of the Clean Water Act.

84.     Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d) and 1365, Defendant is liable for civil penalties of up to $37,500 per day for its unpermitted discharges.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

1.  Declaring that Defendant has violated and is in continuing violation of the CWA;

2.  Enjoining Defendant from allowing further unpermitted discharges of (1) total dissolved solids (TDS), (2) sulfates ($SO_4^{2-}$), and (3) other ions associated with the

measure of conductivity in surface coal mine drainage;

3. Ordering Defendant to pay appropriate civil penalties up to $37,500 per day for each CWA violation;

4. Ordering Defendant to conduct monitoring and sampling to determine the environmental effects of its violations, to remedy and repair environmental contamination and/or degradation caused by its violations, and restore the environment to its prior uncontaminated condition;

5. Awarding Plaintiffs' attorney and expert witness fees and all other reasonable expenses incurred in pursuit of this action; and

6. Granting other such relief as the Court deems just and proper.


Respectfully submitted,

/s/ Benjamin A. Luckett
Benjamin A. Luckett (W.Va. Bar No. 11463)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-0125

*Counsel for Plaintiffs*