IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY INC.,
and SIERRA CLUB,

                Plaintiffs,

v.                                CIVIL ACTION NO.   3:14-11333

POCAHONTAS LAND CORPORATION,

                Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Summary Judgment and for Declaratory and Injunctive Relief and Civil Penalties (ECF No. 35) and Defendant's Motion for Summary Judgment (ECF No. 38).[1]   For the following reasons, Plaintiffs' motion is **GRANTED**, in part, and **DENIED**, in part, and Defendant's motion is **DENIED**.

## I.     BACKGROUND

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), West Virginia Highlands Conservancy, and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., ECF No. 1.

---

[1] Consistent with rulings made during the May 4, 2015 Pre-Trial Conference, Plaintiffs' Motion for Leave to File Second Declaration of Meghan Betcher (ECF No. 47) is **GRANTED**; Defendant's Motion in Limine to Exclude the Testimony of Levi Rose (ECF No. 53) is **DENIED**; Defendant's Motion in Limine to Limit the Testimony of Meghan Betcher to Water Sampling and Exclude Testimony from Meghan Betcher (ECF No. 54) is **DENIED** as moot; Plaintiffs' Motion to Amend First Amended Complaint (ECF No. 57) is **GRANTED**; and Plaintiffs' Motion for a View of Defendant's Valley Fills (ECF No. 58) is **HELD IN ABEYANCE**.   The Court **DIRECTS** the Clerk to file Plaintiffs' Second Declaration of Meghan Betcher (ECF No. 47-1) and Plaintiffs' Second Amended Complaint (ECF No. 57-1).

Before proceeding to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

### A. Regulatory Framework

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342.  Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342.  A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b).  West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982).

Relevant to this case, coal mining operations are required to obtain NPDES permits for "discharges of pollutants" to navigable waters from any "point source." 33 U.S.C. §§ 1342, 1362(12).  The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. §1362(14).  By way of example, water collected in sediment ponds at the toe of a valley fill and then released through a discrete conveyance into navigable downstream waters is unequivocally recognized as a "point source" discharge requiring a NPDES permit.

-2-

In addition to CWA requirements, coal mining operations are also subject to regulation under the Surface Mining Control and Reclamation Act ("SMCRA"), which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. In 1981, West Virginia received conditional approval of its state-run program, which is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b.

Federal and state surface mining laws require that after an area has been mined, the disturbed area be "reclaimed" and returned, to the extent possible, to its original contour and condition. *See generally* The Surface Mining Control and Reclamation Act of 1977, Pub.L. 95–87 (*codified at* 30 U.S.C. §§ 1201–1328), and the West Virginia Surface Coal Mining Reclamation *1281 Act, W.Va.Code §§ 22A–3–1 to 22A–3–40. West Virginia requires mine operators to post bonds as means to ensure that such reclamation efforts are undertaken. *See* W.Va. Code R. § 38-2-11 *et seq.* West Virginia phases release of reclamation bonds in three stages. *See* W.Va. Code R. § 38-2-12 *et seq.* First, after completing required "backfilling, regrading (which may include the replacement of topsoil) and drainage control of a bonded area," WVDEP may grant

Phase I bond release, releasing sixty percent of the original bond. W.Va. Code R. § 38-2-12.2.c.1.

Next, after the regraded property has been revegetated as prescribed by an approved reclamation

plan and the property is "not contributing suspended solids to stream flow or runoff outside the

permit area," WVDEP may grant Phase II bond release, releasing an additional twenty-five

percent of the original bond. W.Va. Code R. § 38-2-12.2.c.2.   Finally, upon successful

completion of all bond requirements, WVDEP may grant Phase III bond release, releasing the full

remainder of the original bond. W.Va. Code R. § 38-2-12.2.c.3.   As a further limitation on bond

release, "no bond release will be granted if, at the time, water discharged from or affected by the

operation requires chemical or passive treatment in order to comply with applicable effluent

limitations or water quality standards." W.Va. Code R. § 38-2-12.2.e.

### B.  Factual Background

On or about December 5, 1986, Defendant Pocahontas Land Corporation took possession

of two tracts of land along the Right Fork of Ben Creek in Mingo, County, West Virginia, by

Special Warranty Deed.   At the time Defendant acquired the tracts, each included valley fills that

had been constructed coincident to past surface mining activities.   As previously explained by

Judge Copenhaver:

> "valley fills" are constructed from and used to dispose of the spoil or coal mine
> waste material generated during mining operations.   The fills are constructed by
> filling a designated portion of a valley with spoil or waste material. . . . Diversion
> ditches and underdrains must be provided when spoil or waste is disposed of in a
> valley or head-of-hollow fill in order to insure that the fill remains stable and not
> subject to slippage.   The water collected by these drainage systems is channelled
> away from the fill and eventually into a sedimentation pond.

*West Virginia Coal Ass'n v. Reilly*, 728 F.Supp. 1276, 1281 (S.D. W.Va. 1989).   After mining has

ceased, an operator may seek to abandon, or remove, sediment ponds as reclamation progresses.

W.Va.  Code  R.  § 38-2-5.4.h.   Each  of  the  valley  fills  at  issue  here  is  in  precisely  that

post-reclamation state: sediment ponds with associated NPDES permits are long retired, and unpermitted discharges from the toe of each valley fill now flow directly into downstream waters.

1. *Walnut Hollow Valley Fill*

Defendant's property includes the former Twisted Gun Gap Surface Mine, operated by Chafin Branch Coal Company pursuant to West Virginia Surface Mining Permit S0043338. *See* Mingo County Tax Map, ECF No. 35-3; Excerpts from S008476 Permit File, ECF No. 35-4; Aerial Image of S008476 Permit Boundary, ECF No. 35-5. In connection with surface mining operations, a valley fill was constructed in Walnut Hollow, a tributary to Right Fork of Ben Creek. Likely completed by 1980, the Walnut Hollow Valley Fill was formed by side-dumping overburden material into the valley. Def.'s Ex. 8, ECF No. 38-8. While the mine was active, there was a sediment pond at the toe of the Walnut Hollow Valley Fill, and discharges therefrom were regulated by WV/NPDES Permit No. WV0043338. Def.'s Ex. 9, ECF No. 38-9.

In December 1988, WVDEP granted the mining operation a Phase I bond release. Def.'s Exs. 7 and 10. In 1996, after application and submission of water quality data taken from above the sediment pond, WVDEP granted the mining operation Phase II and Phase III bond release. Def.'s Exs. 7, 10, and 12.

On December 13, 2012, Mr. Levi Rose, hired by Plaintiff Sierra Club, collected water samples at a culvert in Walnut Hollow, downstream of the Walnut Hollow Valley Fill and upstream of the confluence with Right Fork of Ben Creek. Rose Dec., ECF No. 35-9. Analysis revealed elevated levels of conductivity (1106 μS/cm), sulfates (449.76 mg/L), and total dissolved solids ("TDS") (802 mg/L).

On December 2, 2014, the parties jointly inspected the Walnut Hollow Valley Fill, and took water samples from the discharge at the valley fill toe and the receiving stream immediately

downstream. Betcher Dec. ECF No. 35-10.   Analysis revealed elevated levels of conductivity, sulfates, calcium, magnesium, and TDS, as shown in the chart below. *Id.*

| Sampling Location | Field Conductivity (µS/cm) | Lab Conductivity (µS/cm) | TDS (mg/L) | Sulfate (mg/L) | Calcium (mg/L) | Magnesium (mg/L) | Alkalinity – CaCO3 (mg/L) |
|---|---|---|---|---|---|---|---|
| Walnut Hollow VF Toe | 1395 | 1400 | 1100 | 700 | 100 | 120 | 200 |
| Walnut Hollow In-stream | 1377 | 1400 | 1000 | 660 | 93 | 110 | 210 |

Plaintiffs claim—and it appears Defendant does not dispute—that the Walnut Hollow Valley Fill is the only likely source of elevated pollution levels in the Walnut Hollow watershed. *See* ECF No. 36 at 5.

###    2. *Buck Branch Durable Rock Fills*

Defendant's property also includes the former Pounding Mill No. 1 Surface Mine, operated by Mingo Logan Coal Company pursuant to West Virginia Surface Mining Permit S503889. Def.'s Ex. 2.   In connection with surface mining activities, Durable Rock Fills No. 4-5 and No. 6 were constructed in small forks of Buck Branch of Right Fork of Bench Creek.[2] Pls.' Ex. 11, Pounding Mill No. 1 Mine Map, ECF No. 35-11.   Both Durable Rock Fill No. 4-5 and No. 6 were constructed by end dumping 80% durable rock.   Durable Rock Fill No. 4-5 was completed in late 1995, and Durable Rock Fill No. 6 was completed in late 1996 or early 1997. Def.'s Ex. 8, ECF No. 38-8.   While the mine was active, the Buck Branch Durable Rock Fills all drained into a single sediment pond, and discharges therefrom were regulated as Outfall 031 under WV/NPDES Permit WV1016288. Def.'s Exs. 3 and 4.

---

[2] Durable Rock Fill No. 4-5 was originally permitted as two distinct fills (No. 4 and No. 5) in close proximity to one another.   WVDEP later approved the addition of more overburden material, eventually merging the two fills into the singular Durable Rock Fill No. 4-5.

In 1997, WVDEP granted the mining operation a Phase I bond release. Def.'s Ex. 2.   In 2003, WVDEP granted the mining operation a Phase II bond release.   By 2006, the sediment pond below the Buck Branch Valley Fills had been removed, and WVDEP dropped Outfall 031 from the WV/NPDES permit. Def.'s Ex. 5.   In 2011, WVDEP granted the mining operation final Phase III bond release. Def.'s Exs. 2 and 6.

On December 13, 2012, Plaintiffs took a water sample at a culvert just downstream of Durable Rock Fills No. 4-5 and No. 6.   ECF No. 35-9.   Analysis revealed elevated levels of conductivity (746 μS/cm), sulfates (312.70 mg/L), and TDS (510 mg/L).

On December 2, 2014, the parties jointly inspected Durable Rock Fills No. 4-5 and 6, and took water samples from the discharge at the toes of each fill, immediately downstream, and just downstream of the confluence with Buck Branch.   Again, analysis revealed elevated levels of conductivity, sulfates, calcium, magnesium, and TDS, as shown in the chart below.

| Sampling Location | Field Conductivity (μS/cm) | Lab Conductivity (μS/cm) | TDS (mg/L) | Sulfate (mg/L) | Calcium (mg/L) | Magnesium (mg/L) | Alkalinity – CaCO3 (mg/L) |
|---|---|---|---|---|---|---|---|
| No. 4-5 Toe | 1365 | 1300 | 1000 | 810 | 92 | 100 | 110 |
| No. 4-5 In-stream | 1299 | 1300 | 970 | 780 | 87 | 100 | 110 |
| No. 6 Toe | 1135 | 1100 | 810 | 580 | 78 | 86 | 140 |
| No. 6 In-stream | 1118 | 1100 | 780 | 560 | 75 | 83 | 140 |
| Buck Branch | 1194 | 1200 | 850 | 640 | 82 | 93 | 120 |

Plaintiffs claim—and it appears Defendant does not dispute—that Durable Rock Fills No. 4-5 and 6 are the only likely source of elevated pollution levels in the Buck Branch watershed. *See* ECF No. 36 at 6.

Now pending before the Court are cross motions for summary judgment.   The motions have been fully briefed, the Court heard oral argument on the motions during the May 4, 2015

Pretrial Conference, and both motions are ripe for resolution.   In Section II, the Court introduces and applies jurisdictional and standing requirements.   In Section III, the Court discusses the legal standard applicable to motions for summary judgment.   In Section IV, the Court considers the parties' arguments for summary judgment.

## II.        STANDING & JURISDICTION

### A. Article III Standing

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies").   In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).   In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)).   Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to

determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs assert—and Defendant does not object—that they establish representational standing through Donna Branham, who is a member of all the plaintiff organizations. Branham Dec., Feb. 27, 2014, ¶¶2–4, ECF No. 35-15. Ms. Branham grew up in the area and frequented the creeks and streams of the Tug Fork watershed, including Ben Creek. *Id.* at ¶¶5, 10, 14, 16. She continues to regularly visit Ben Creek, including areas near Buck Branch and Walnut Hollow. *Id.*

at ¶¶15, 18.  Ms. Branham is familiar with the effects of elevated ionic pollution, has personally engaged in water monitoring in various locations in Mingo County, and is well aware that discharges from the valley fills at issue in this litigation are harming the receiving streams. *Id.* at ¶¶12, 13.  Though Ms. Branham would like to take her grandchildren to area streams and creeks to explore them as she did in her own childhood, she does not do so because of the extent of pollution and number of unregulated pollution sources in the region. *Id.* at ¶17.  Ms. Branham and her family would gain greater enjoyment from the streams if pollution sources were monitored and controlled. *Id.* at ¶19.

Through these facts, Ms. Branham sufficiently alleges that she has suffered an injury-in-fact that is fairly traceable to Defendant's discharges of ionic pollution.  Her injuries can be redressed by the requested injunctive relief. *See Gaston Copper*, 2014 F.3d at 149, 162–63 (explaining that, with respect to claims seeking injunctive relief, the redressibility requirement can be met by "alleging a continuing violation or the imminence of a future violation").  For these reasons, Ms. Branham has standing in her own right, thereby satisfying the first requirement of organizational standing.  Additionally, litigation regarding water pollution from former surface mining activities is germane to the purposes of plaintiff organizations: namely, the protection of the environment and clean water. And finally, the claims asserted and the requested relief do not require participation of individual members. Accordingly, the Court finds that Plaintiffs have satisfied the Article III organizational standing requirements.

**B.  CWA 60-day Notice Requirement**

Under the CWA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA, and the state in which the alleged violation occurs. 33 U.S.C. § 1365(b)(1)(A).  On November 25, 2013, Plaintiffs provided notice

of their intent to sue, specifically detailing the alleged violation, by certified mail. See Notice of

Intent, ECF No. 35-16.   The lawsuit was commenced over sixty days later, on February 27, 2014.

See Complaint, ECF No.1.   Defendant does not challenge the sufficiency of the Notice in its

Response or in its own Motion for Summary Judgment.   The Court finds that Plaintiffs have

satisfied the 60-day notice requirement.

### III.    STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R.

Civ. P. 56(a).   In considering a motion for summary judgment, the Court will not "weigh the

evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (1986).   Instead, the Court will draw any permissible inference from the underlying facts in

the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable

to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence

from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at

256.   Summary judgment is appropriate when the nonmoving party has the burden of proof on an

essential element of his or her case and does not make, after adequate time for discovery, a

showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).   The nonmoving party must satisfy this burden of proof by offering more than a mere

"scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the

defendant on an affirmative defense—his showing must be sufficient for the court to hold that no

reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Having discussed the standard for review of motions for summary judgment, the Court now turns to the parties' arguments.

### IV.    ANALYSIS

The central issue posed in this litigation is whether these valley fills are "point sources," therefore requiring NPDES permits.  Plaintiffs argue that discharges from the valley fills are discernible, confined, discrete conveyances and that Defendant is committing ongoing violations of the CWA by discharging pollutants from point sources into waters of the United States without first applying for and obtaining the required NPDES permit.   Defendant also moves for summary judgment, arguing that the discharges complained of are not subject to regulation under the CWA because: (1) groundwater migration is not subject to CWA § 402 requirements; (2) the valley fills do not produce "confined" and "discrete" discharges; (3) any discharge from the valley fills is merely migration from a previous discharge; (4) Defendant is not actively "adding" any pollutants to downstream waters; and (5) Plaintiffs' complaint amounts to an impermissible collateral attack on the WVDEP's bond release decision. ECF No. 40.   Thought the Court will briefly discuss each issue raised by Defendant, ultimately, summary judgment is precluded because material issues of fact remain with respect to whether the valley fills at issue are "point sources," and so the Court begins its analysis with that issue.

**A.  Whether these valley fills are "point sources" remains a material issue of fact.**

The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).   This definition furthers the CWA's scheme "by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." *U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979); *see also Ohio Valley Envtl. Coalition, Inc. v. Hernshaw Partners, LLC*, 984 F.Supp.2d 589, 598 (S.D. W.Va. 2013) (explaining that "the definition of a 'point source' is intended to be interpreted broadly, as indicated by the statute's 'including by not limited to' language").   In contrast, courts have limited the non-point source designation "to uncollected runoff water from, for example, oil and gasoline on a highway, which is difficult to ascribe to a single polluter." *Washington Wilderness Coalition v. Hecla Min. Co.*, 870 F.Supp. 983, 988 (E.D. Wash. 1994).

Whether a discharge from a point source exists is a question of fact. *See Sierra Club v. Abston*, 620 F.2d 41 (5th Cir. 1980) (remanding for consideration of fact issues regarding whether subject spoil piles and sediment basins were point sources under the CWA).   As explained by both Plaintiffs and Defendant's expert, Mr. McCulloch, these valley fills were specifically designed to collect, channel, and convey water to be discharged at the toe.   As interpreted by Plaintiffs, because the valley fills collect and channel water, resulting in a discharge at the toe of each valley fill by design, the valley fills are point sources.   In contrast, whatever the original design features, Defendant's expert characterizes the discharges from the toe of each valley fill as

"ill-defined" and not a "confined or discrete conveyance" as required under the CWA.[3]   Whether the valley fill toes are sufficiently "discrete" so as to be considered "point sources" thus remains a contested issue of material fact, foreclosing the possibility of judgment as a matter of law.

### B.  CWA jurisdiction can include discharges to surface water via hydrologically connected groundwater.

Defendant argues that the discharges at issue are properly characterized as "groundwater," and accordingly, are not subject to regulation under § 402 of the CWA.   Defendant's expert, Charles McCulloch, examined the valley fills at issue and concluded that the "water emerging from these three valley fills is groundwater," comparable to "groundwater emerging from diffuse springs or seeps." McCulloch Aff. ¶¶11, 13.   According to Mr. McCulloch, both surface water and groundwater flow into the fills, and "[r]egardless of the original source . . . the water within these valley fills is groundwater as it is below the surface of the valley fills on which thick vegetation is growing, and is contained in interconnected pores of the saturated zone." McCulloch Aff. ¶11.

As an initial matter, the Court agrees that NPDES permits are not required for groundwater discharges.   However, that point is of little import as Plaintiffs have not alleged that Defendant is liable for leaching pollutants into the groundwater.   Instead, Plaintiffs allege direct discharges to surface waters.   Indeed, Defendant may be required to seek a NPDES permit even if groundwater is somehow hydrologically connected to or comingled with the alleged unlawful discharges to surface waters.   As explained by the EPA via proposed NPDES regulations:

---

[3]   As further explained by Mr. McCulloch, "[w]hile all of the groundwater that emerges from these valley fills does so around the base and tow area, the bases and toes of these fills are somewhat ill-defined, likely due to the fact that they were formed by end dumping, during which the overburden material is deposited at higher elevation in the valleys and allowed to roll to its final resting place lower in the valleys." McCulloch Affidavit ¶12, ECF No. 38-3.[3]

> EPA does not argue that the CWA directly regulates ground water quality. In the Agency's view, however, the CWA does regulate discharges to surface water which occur via ground water because of a direct hydrologic connection between the contaminated ground water and nearby surface water. EPA repeatedly has taken the position that the CWA can regulate discharges to surface water via ground water that is hydrologically connected to surface waters.

U.S. Environmental Protection Agency, National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations, 66 Fed. Reg. 2960-01, 3016 (January 12, 2001) (further explaining that "as a legal and factual matter, EPA has made a determination that, in general, collected or channeled pollutants conveyed to surface waters via ground water can constitute a discharge subject to the Clean Water Act."); s*ee also Williams Pipe Line Co. v. Bayer Corp.*, 964 F.Supp. 1300, 1319 (S.D. Iowa 1997) ("The majority of courts have held that groundwaters that are hydrologically connected to surface waters are regulated waters of the United States, and that unpermitted discharges into such groundwaters are prohibited"); *Hawai'i Wildlife Fund v. County of Maui*, 24 F.Supp.3d 980, 994–96 (D.Hawai'i 2014) and *Northern Plains Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1161 (9th Cir. 2003). Thus, without even considering whether Defendant's expert has properly characterized water contained in the valley fill as "ground water,"[4] discharges to surface water from the toe of the valley fills may still require a NPDES permit.

### C. NPDES permits may be required for discharges that exist post-bond release, even where WVDEP has not previously required such permits.

---

[4] As candidly recognized by the Army Corps of Engineers, mining activities such as these "permanently alter the normal water flow within the footprint of the fills." CDD *for Republic No. 2 Surface Mine Application* ("*Republic No. 2 CDD* "), 17 (July 6, 2006). "[V]alley fills will permanently bury the streams along with their riparian areas, permanently alter the normal water flow within the area under the fill, and destroy or disrupt the living organisms and their habitats within the valley." *OVEC v. US ACOE*, 479 F.Supp.2d 607, 629 (S.D. W.Va. 2007) (rev'd on other grounds by *OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009).

Defendant argues that it is entitled to summary judgment because (1) historically, relevant agencies have not required post-reclamation valley fills to apply for or obtain NPDES permits and (2) by bringing a CWA citizen suit, Plaintiffs impermissibly collaterally attack the WVDEP's bond release decision.  With respect to such arguments, the Court first observes that agency determinations, whatever they may be, do not trump the CWA's unequivocal grant of authority for private parties to bring citizen suits challenging operator and agency action or inaction alike. Indeed, private citizens are empowered to bring suits under the CWA precisely to allow challenges to agency determinations.  As originally drafted and to this day, the plain text of the CWA authorizes citizen suits:

> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

33 U.S.C. § 1365 (2014).  Furthermore, "a court may, in entertaining a citizen suit, decide whether a discharge of particular matter into navigable waters violates the CWA even though the regulating agency determined that the discharge was not subject to the requirement of a permit." *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007); *see also Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002) (explaining that while an agency determination that a NPDES permit is not required may be considered by the court, it does not "divest the federal courts of jurisdiction," because "Congress [has] empowered citizens to pursue enforcement of the Clean Water Act when all procedural requirements [are] satisfied."); *Sierra Club v. Cedar Point Oli Co.*, 73 F.3d 546, 566–67 (5th Cir. 1996) (explaining that "a court may determine in a citizen suit whether a discharged substance is a

pollutant, notwithstanding the fact that EPA has failed to issue a permit or to promulgate an effluent limitation that regulates the discharge.").   Accordingly, while the Court will surely consider agency judgments on the question of whether a post-reclamation valley fill may be a point source, such judgments do not affect the Court's jurisdiction.

Finally, if determined to be a "point source," WVDEP bond release does not translate to practical immunity from the NPDES permit scheme.  As previously explained by the Fourth Circuit, the EPA has unequivocally recognized that post-mining discharges are subject to NPDES permitting:

> [T]he EPA issued regulations in 1985 establishing that post-mining discharges are covered by the NPDES scheme.  In those regulations, the EPA "reemphasize[d] that post-bond release discharges are subject to regulation under the Clean Water Act," observing that "[i]f a point source discharge occurs after bond release, then it must be regulated through an NPDES permit."  The comments to the rule sharpen this point, flatly stating that "*[a]ny point source discharge after bond release does require a permit*." *Id.* at 41304 (emphasis added). To the extent parties do not comply, the regulations state that they will be "subject to enforcement action by EPA under section 309 of the Act and by citizens under section 505(a)(1) of the Act." *Id.* at 41298.

*West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 166 (4th Cir. 2010). Moreover, whatever the requirements of SMCRA may be, they do not operate to frustrate or impeded CWA enforcement where violations are found. *See* 30 U.S.C. § 1292(a)(3) (SMCRA savings clause providing that "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing" the CWA or rules and regulations promulgated thereunder).

**D.  Defendant's valley fills may be ongoing discharges of pollutants.**

As argued by Defendant, it should not be required to apply for a NPDES permit because construction and reclamation of these valley fills was a wholly past, and then permitted, activity. However, ongoing discharges of pollutants require permits even if the discharger is no longer actively managing the discharge. *See Sierra Club, Mineral Policy Center v. El Paso Gold Mines,*

*Inc.*, 2002 WL 33932715, *6 (D.Colo. 2002) (quoting *Umatilla Waterquality Protective Ass'n, Inc. v Smith*, 962 F.Supp. 1312, 1322 (D.Or. 1997)) ("a discharge of residual pollutants collected in an unlined brine pond is an ongoing discharge from a point source, 'even if the discharger is no longer adding pollutants to the point source itself.'").  Moreover, "[t]he [CWA] contains no causation requirement; in other words, it is not a defense that a person currently discharging pollutants did not initially cause the discharge." *Southern Appalachian Mountain Stewards v. Penn Virginia Operating Co., LLC*, No. 2: 12-cv-00020, 2013 WL 57648 at *2 (W.D. Va. 2013) (citing *W.Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010) ("On its face, 33 U.S.C. § 1311(a) bans 'the discharge of any pollutant by any person' regardless of whether that 'person' was the root cause or merely the current superintendent of the discharge. In other words, the statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.").  Accordingly, CWA liability cannot be avoided merely because the valley fills were previously constructed and are not presently actively managed.  If Plaintiffs can present evidence establishing ongoing point source discharges, Defendant may be required to seek a NPDES permit even though the site is no longer actively mined. *See Sierra Club v. El Paso Gold Mines*, 421 F.3d 1133 (10th Cir. 2005) ("[H]ere we have a manmade point source that delivers pollutants and continues to discharge them . . .. These facts distinguish this case from those involving the migration of pollutants from prior discharges.").

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment and for Declaratory and Injunctive Relief and Civil Penalties (ECF No. 35) is **GRANTED**, in part, and **DENIED**, in part, and Defendant's Motion for Summary Judgment (ECF No. 38) is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        May 7, 2015

_____
ROBERT C. CHAMBERS, CHIEF JUDGE